# In The Matter Of:

*William A. Rushworth, Sr. v.*
*Salah & Pecci Leasing Company, Inc., et al*

---

*William Huling*
*February 15, 2008*

---

*Reporting Associates*
*10 Dorrance Street*
*Westminster Square Building Suite 617*
*Providence, RI 02903*
*(401) 351-1660*

*Original File FEB15CZ.TXT, 237 Pages*
*Min-U-Script® File ID: 0024395706*

**Word Index included with this Min-U-Script®**

Page 69

high cab; correct?
A: That's not what we received. The machine that we originally received did not have a high cab.
Q: Well, have you reviewed any documents before coming here today to assist you in remembering different things for the purpose of giving testimony?
A: Yes.
Q: Did you review any paperwork? What documents did you review?
A: The lease agreement, some maintenance records, and OSHA violations. That's it.
Q: Before the lease was executed did you personally generate any writings either by e-mail or in writing that concerned the specifications for the piece of equipment that Metals was seeking?
A: I don't believe so.
Q: Have you ever seen any writings by anyone at Metals which specified the piece of equipment or the type of equipment that they were looking for at that time?
A: No.
Q: No?
A: No.
Q: Okay. Did you ever see a document that's entitled

Page 70

Equipment Proposal?
A: Not that I recall.
Q: Okay. Do you recall signing any documents other than the actual lease agreement, incidental to the lease of this particular crane?
A: No, no, I don't.
Q: No, you don't recall?
A: No.
Q: Now, there came a time when you received a crane at Metals at the Providence location; is that true?
A: Yes.
Q: And was that before — did you actually get possession of that crane before or after the lease was executed?
A: I don't remember. I don't remember the date.
Q: Do you remember any occasion where you saw the crane, you personally saw the crane again, other than the observation you described earlier, before lease was executed?
A: No.
Q: Were you present when the crane was taken to the Metals' premises?
A: Yes.
Q: What type of crane was delivered to Metals?

Page 71

A: Manitowoc M250.
Q: High cab or low cab?
A: Low cab.
Q: What was the lifting capacity on it?
A: I don't remember.
Q: You don't remember?
A: No.
Q: Boom length? Do you remember?
A: One hundred sixty feet.
Q: Was that the same crane you had seen at Quonset Point?
MR. GOLDBERG: Object to the form.
A: To the best of my knowledge it looked like the same crane.
Q: The one you saw the Quonset had a low cab?
A: No.
Q: Had a high cab?
A: Yes.
Q: Other than the positioning of the cab, did you notice anything else different about the one that got delivered to Metals?
A: No, I didn't.
Q: What is a bare lease — I'm sorry — a bare rental?
A: You want my interpretation of a bare rental?

Page 72

Q: Yes.
A: Means that it comes without an operator.
Q: Does it have any other significance other than that?
A: If there are repairs that need to be done to the crane that happen due to your operation, things that happen during the course of your operation above and beyond major failures, that the company that's leasing or renting the piece of equipment would cover those repairs.
Q: When you say that company would cover those repairs, what do you mean by that?
A: Pay for those repairs.
Q: They would pay for those repairs?
A: Yes.
Q: And would they also perform those repairs?
A: On some occasion they would perform the repairs if they were capable of doing that.
Q: On other occasions they would make arrangements to have other people repair them?
A: That's correct.
Q: On a bare rental who does day-to-day maintenance of the piece of equipment?
A: The company that's renting the piece.
Q: So that would be the party who leased it? In this

Page 73

case it would be Metals?
A: That's correct.
Q: Above and beyond day-to-day maintenance, any other repairs on that piece of equipment, if it's under a bare rental it's done by the entity who leased it; correct?
MR. GOLDBERG: Object to the form.
A: I'm a little confused on the question.
Q: On a bare rental, let's say this crane was on a bare rental from Salah & Pecci to Metals. Which entity would do repairs needed?
A: Salah & Pecci.
Q: Was that the case with regard to the crane in question, that being the crane that was leased from Salah & Pecci to Metals?
A: Yes, it was.
Q: The cranes that Metals owned at the time that this lease was undertaken, were those cranes inspected on a regular basis?
A: Yes.
Q: Do you know who conducted the inspections on those cranes that Metals owned?
A: The operators.
Q: Just the operators?
A: Yes.

Page 74

Q: Okay. Now, given what you described as a bare rental, it's clear that Salah & Pecci was not providing operators for the crane as part of the lease of this equipment. Correct?
A: Correct.
Q: The operators for this particular piece of equipment, they were Metals employees?
A: Yes.
Q: I apologize if I've asked this before, but I want to be absolutely clear on this. You had no personal, no conversations, no personal input or exchanges with anyone at Salah & Pecci concerning the lease that's the subject of this inquiry, —
A: No.
Q: — the lease of December 5, 2000?
A: No.
Q: Can you explain why it is you signed the lease when you had nothing to do with it?
MR. KELLEHER: Objection.
MR. QUIGLEY: Objection. Rental.
Q: I'm sorry, the rental.
A: I was told to sign it.
Q: Well, who to your knowledge did do the negotiations with representatives of Salah & Pecci?

Page 75

A: I don't know.
Q: You don't know. Other than the rentals that we talked about for loading of ships, had Metals ever leased any piece of equipment?
A: Not to my knowledge.
Q: So this would be the first, to your knowledge, occasion where Metals as a business entity took a piece of equipment in on a lease?
A: Yes.
Q: Now, you were familiar with some of the reasoning why they wanted the equipment. We've talked about that; correct?
A: Correct.
Q: Was it the intention of Metals to keep that equipment on site so that it would be available for use in the loading of ships?
A: Yes.
Q: Okay. And where was it to be kept? Was it in the Johnston location or the Providence location?
A: Providence location.
Q: Was there an increase in the business of Metals in terms of loading ships around that time that caused the company to think it would be best to have a crane for ship loading available?
A: No.

Page 7

Q: There was not?
A: No.
Q: Were any of the other cranes owned by Metals ever used for the loading of ships?
A: No.
Q: I'm going to go back to when the crane was delivered to Metals. I take it it was delivered in pieces, obviously; correct?
A: That's correct.
Q: Were you present when it was assembled at the Providence location?
A: I was present at various times during the assembly process.
Q: How long would you say the assembly process took?
A: Close to a week.
Q: Now, Metals employees were involved in the assembling process?
A: Yes.
Q: Were Salah & Pecci employees involved in the assembling process?
A: Yes.
Q: Were any other business entities involved?
A: Not that I know of.
Q: To your knowledge was anyone from Manitowoc present during the assembly on site in Providence

Page 141

Q: And when you first met him what was his job? What was he doing for a living?
A: He was an equipment operator.
Q: And once you started working for Metals Recycling was Todd always employed there during the time you were employed there?
A: As far as I know, yes.
Q: Were there times when you were a supervisor of his, given that you were an Operations Manager and he was an equipment operator?
A: Yes.
Q: Did you ever, in your capacity as a supervisor of Todd, have any questions concerning his qualifications for the operation of a crane?
MR. KELLEHER: Objection.
A: No.
Q: Did you have ever any complaints about his operation of a crane?
A: Yes.
Q: To whom — who made these complaints to you?
A: I'm sorry?
Q: Who made the complaints to you?
A: Oh, no, I thought you said did I have complaints.
Q: Oh, did you have complaints. Okay. But I'm asking did anyone other than you ever voice a

Page 142

complaint about Todd's —
A: Yes.
Q: — capabilities as a crane operator?
A: Not capabilities, no.
Q: Well, what regarding his crane operating abilities was mentioned to you?
A: Todd went to try and go fast. He was, ah, very aggressive.
Q: What do you mean by going fast? He was trying to do his job quickly, —
A: Yes.
Q: — in terms of moving the scrap metal, unloading it where it needed to be loaded?
A: Yes.
Q: Can you recall someone that brought that to your attention, or is that something you personally observed?
A: The person that trained him, Joe Dupra, mentioned that to me.
Q: What did you do in hearing that?
A: I sat and talked to Todd a number of times in terms of how he operated equipment. And it wasn't just that piece of equipment, it was pieces of equipment in the, within the facility.
Q: Who trained Todd to work on this particular crane?

Page 143

A: Joe Dupra.
Q: To your knowledge did Todd receive training from anyone outside of Metals for the operation of this particular crane?
A: No.
Q: When Todd would start his shift operating this crane, he would be filling out the operator's checklist just as other operators would; correct?
A: Correct.
Q: Did Todd ever bring to your attention, in filling these out, any problems he had with the operation of the crane?
A: No.
Q: Do you know how many hours roughly Todd Rushworth individually would have logged on this particular crane before July 14th of 2003?
A: I do not. I do not.
Q: Do you know for how long Todd was employed as a full-time crane operator with Metals?
A: Todd was a full-time equipment operator and that meant that he would run various pieces of equipment at various times throughout, throughout the yards.
Q: From the time that Metals acquired this particular crane, up until Todd's death, how many operators

Page 144

were there on that particular piece of equipment? Todd and who else?
A: Todd, Joe Dupra, Robert Vinacco, and there may have been one or two from outside the company that operated it, as well.
Q: Were you working at the time that this incident occurred?
A: No.
Q: Could you give us the names of the individuals who were working on that site when this incident occurred with Todd?
A: I can give you one because I remember the person that called me.
Q: Okay. Who was that?
A: That was Kevin Sorensen.
Q: And what was his job that evening?
A: Kevin was a Lead Man. He was acting as the Foreman on the night shift.
Q: What were his duties that evening as Lead Man and Foreman of the night shift?
A: He watched over all of the operations to make sure that things were running smoothly, trucks were getting loaded, ships was getting loaded. He was attentive to the ship's crew, if they needed us to move from one hatch to another. He directed the

ss. Providence, Rhode Island
COUNTY OF PROVIDENCE

BE IT KNOWN THAT I, Denise P. Veitch, Certified Shorthand Reporter and Notary Public, reported stenographically the foregoing deposition pursuant to notice at the time and place stated in the caption hereof; that I was then and there a Notary Public in and for the State of Rhode Island; that by virtue thereof I was authorized to administer an oath; that the witness before testifying was duly sworn to tell the truth, the whole truth and nothing but the truth; that the testimony of said witness was reduced to typewriting under my direction; that the foregoing pages contain a full, true and correct transcription of the notes of said deposition; that the deponent has not made the request to read and sign his deposition.

I, FURTHER CERTIFY that I am not of counsel nor attorney for either or any of the parties to said action or otherwise interested in the event thereof, and that I am not related to either or any of the parties to said cause.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal of office this 21st day of February, 2008.

Denise P. Veitch
Certified Shorthand Reporter

My Commission Expires:
September 25, 2009